Argued October 3; defendant suspended October 17, 1939

## In re SHENKER

(94 P. (2d) 724)

In Banc.

*Howard P. Arnest,* of Portland, for Oregon State Bar.

*B. G. Skulason* and *B. H. Goldstein,* both of Portland, for William S. Shenker.

BAILEY, J.  The Oregon State Bar on September 9, 1938, filed with the board of governors of that organization a complaint against William S. Shenker, a member of the Oregon State Bar, charging him with unprofessional conduct.

Three charges are made against Mr. Shenker.  The first is that between February 23, 1932, and October 21, 1936, he appropriated to his own use moneys belonging to his client.  The allegations in relation to this cause of complaint are briefly as follows: that from some time prior to January 8, 1932, until about June 13, 1938, Jacob Spies, about 77 years of age in the year first mentioned, a German by birth and unable to read the English language, was a client of the accused; that on January 8, 1932, Spies and his wife mortgaged their home in Portland to one Lucy Lovegren for $2,000, payable three years after date with interest at the rate of 7 per cent per annum; that on February 23, 1932, Mr. Shenker received from Mr. Spies $1,166.67 in cash and a note for $400 payable to Spies, which cash, together with the proceeds to be collected from the note, was to be held by Mr. Shenker and applied on the Lovegren mortgage; that thereafter Mr. Shenker collected the full sum of $400 as principal of the note, and $24 interest; and that in addition to the above sums of money he received $700 from Mr. Spies to be applied on the Lovegren mortgage, making a total of at least $2,290.67.

It is further alleged that Mr. Shenker appropriated to his own use the several amounts above mentioned, totaling $2,290.67, and did not pay the indebtedness evidenced by the Lovegren mortgage, except that "from time to time said Shenker paid various amounts of interest on said Lovegren mortgage, and on November 23, 1936," $500 on the principal; that on December 8, 1937, a suit was instituted by Lucy Lovegren in the circuit court for Multnomah county to foreclose the mortgage, on which there remained a balance of $1,500 unpaid on the principal, with interest due thereon from July 7, 1937; that on May 6, 1938, judgment was recovered by the plaintiff in that suit for the balance due on the mortgage and for attorney's fees, costs and disbursements, totaling $1,821.87; that thereafter the property covered by the mortgage was sold at sheriff's sale to Lucy Lovegren, the mortgagee, for the full amount of her judgment; and that on June 25, 1938, on demand of the attorney then representing Mr. Spies, Mr. Shenker paid to Mr. Spies the sum of $1,169.12.

The second cause of complaint sets forth that on frequent occasions between January 8, 1935, and February 19, 1938, Mr. Shenker represented to Mr. Spies that the moneys paid by the latter to him had been paid to apply on the indebtedness secured by the Lovegren mortgage, and led Mr. Spies to believe that the Lovegren debt had been paid in full and the mortgage lien discharged.

The third cause of complaint alleges that Mr. Shenker, purporting to act on behalf of Jacob Spies and his wife in the foreclosure proceedings, prepared an answer to the complaint therein and verified such answer on behalf of the defendants, and in the verification stated and swore that the same was made by him "for

the reason that they [Jacob Spies and Elizabeth Spies, his wife] are not available at this time''; and that such verification was false and fraudulent and was knowingly and intentionally made by Mr. Shenker "as a part of his plan, scheme and purpose to deceive said Spies and keep from him the true facts in reference to said Lovegren mortgage, and was a fraud on the court in which said suit was pending.''

The defendant in his answer admits the relationship between himself and Spies during the time alleged in the complaint, and the receipt by him from Spies of the amounts of money set forth in the complaint, with the exception of $500 which will hereinafter be mentioned. He denies that he misappropriated any of the money and alleges that he received it as a loan, with the understanding that he was to pay for the use thereof 4 per cent per annum and apply it as interest on the Lovegren mortgage, and that Spies was to pay to him, also to apply thereon, the difference between the 4 per cent to be paid by Mr. Shenker and the 7 per cent required by the mortgage. Mr. Shenker also admits payment of the interest on the Lovegren mortgage and the sum of $500 on the principal, further admits the institution of the foreclosure suit, the sale of the mortgaged property and the purchase thereof by the mortgagee, and alleges that Mr. Spies knew of the proceedings to foreclose the mortgage.

As part of his answer to the first cause of complaint Mr. Shenker sets forth an itemized list of the amounts which he received from Mr. Spies and the sums expended by himself, together with interest on the amounts received by him from Mr. Spies, and further alleges in relation to the $500 hereinbefore mentioned that he received that sum of money from Mr.

Spies but returned it to him, "but, not having any receipt therefor, the accused, therefore, qualifiedly admitted the same" in the statement of account set forth in his answer. In this statement he also lists as claims against Mr. Spies for attorney's fees five separate items, totaling $425.

Mr. Shenker further alleges that he has at all times been ready, willing and able to repay to Mr. Spies the sums of money loaned to him, but that no request was made therefor "until all efforts on the part of Spies to secure sufficient funds to fully satisfy and liquidate the Lovegren mortgage had failed"; and that the delay in making such payment "was due only to the inability of the accused to have a satisfactory accounting and adjustment with Spies of their respective claims."

In his answer Mr. Shenker denies the charges contained in the second and third causes of complaint against him. With reference to the third charge he alleges that he went to the home of Mr. and Mrs. Spies to have one of them verify the answer in the foreclosure suit, and that on finding no one at home he personally made the verification as above indicated.

After charges had been made against Mr. Shenker by Mr. Spies or on his behalf, to the grievance committee of the Oregon State Bar, and after the prosecutor for that committee had instituted an investigation of the matter but before the complaint herein was filed, Mr. Spies died.

Jacob Spies was 76 years of age in March, 1932. He was born in Germany and did not come to America until he was about 42 years of age. He had been married in Germany and lived there until the death of his first wife. Shortly after that event he came to this country, with his three young children. His second

marriage occurred in 1900 in the state of Washington, and of that union also children were born.

Mr. Spies, according to the record, could barely read English and spoke it brokenly, although he seemed to understand the language when it was spoken to him. During his entire life he read the news from papers printed in German. His second wife, Elizabeth, was born in Russia and did not read English. From her testimony in this case it is apparent that she had difficulty understanding some of the questions that were asked her during her examination.

Mr. Shenker first met Mr. Spies in the latter part of 1931 or early in 1932. At that time Mr. Shenker was representing a client who had a claim against Mr. Spies, and in that connection he went to the latter to collect money from him for the client. Mr. Shenker was unable to state the client's name, although he thought it was Gayle, yet he did not remember whether the client was a man or a woman and did not recall the amount which he collected from Mr. Spies.

In the negotiations with Mr. Spies concerning the collection for that client, Mr. Shenker discovered that Mr. Spies owned a note executed by Mr. and Mrs. Osborn for $3,000. In referring to this note Mr. Shenker stated, ". . . and it was on my first visit to his [Spies's] home, when I was going through some of his papers when I advised him of this Osborn obligation, when he first found out about the Osborn transaction, he never knew that it ever existed or that he had a chose of action against Osborn. He didn't even know it until I told him of it."

This note was turned over by Mr. Spies to Mr. Shenker and shortly thereafter action was started by Mr. Shenker as attorney for Mr. Spies to collect the

note. A copy of the complaint therein was introduced in evidence, and it appears therefrom that the note was executed on October 15, 1930, and was payable to a third party, with interest at 6 per cent per annum, the principal to be paid in three installments of not less than $1,000 in any one payment, and the first installment to be paid one year after date. The note had been endorsed by the payee to Mr. Spies. At the time the action was started no part of the principal had been paid and no interest except to April 15, 1931. That matter was settled and on February 23, 1932, in adjustment of the claim $2,500 in cash was paid and a note was given by the Osborns to Mr. Spies for $400, payable on or before two years after date.

Mr. Shenker deducted from the $2,500 cash the amount due his client, whom he charged attorney's fees for services performed in collecting the claim against Mr. Spies. Out of the $2,500 Mr. Spies turned over to Mr. Shenker $1,166.67, together with the $400 note, and Mr. Shenker then gave to him a paper worded as follows:

"Statement and Receipts of Funds Received from Jacob Spies.

"Received of Jacob Spies $1,166.67 to apply upon satisfaction of first mortgage, in amount of $2,000.00 covering property owned by Jacob and Elizabeth Spies. In addition to such sum the writer hereof has also received one certain promissory note of John Osborne and Virginia Osborne, husband and wife, in the amount of $400.00, payable two years after date, with interest at 6% per annum. The proceeds from such note likewise to apply upon liquidation of interest and principal upon $2,000.00 mortgage herein before mentioned. The balance of principal, to-wit, $433.33, together with accumulated interest to be paid by Jacob Spies to the writer hereof, and to apply in full satisfaction of

$2,000.00 mortgage herein before described. The said Jacob Spies likewise agreeing to pay the difference in interest, to-wit: the difference between 4% and 7% upon the moneys herein specified throughout the period of the $2,000.00 mortgage herein before described.

"Feb. 23rd, 1932.

"William S. Shenker".

The record contains receipts given by Mr. Shenker to Mr. Spies, acknowledging payment by the latter of the following sums of money: January 6, 1932, $30; April 5, 1932, $30; June 11, 1932, $30; September 6, 1932, $30; January 9, 1933, $6; April 4, 1933, $30 ($6 paid by Mr. Spies and $24 interest on the Osborn note); July 1, 1933, $30; September 26, 1933, $30; July 6, 1934, $23; and October 2, 1934, $15; total, $254. There is another receipt for $30, which appears to be possibly a duplicate of that given for the payment of June 11, 1932. The trial committee found that Mr. Spies had paid Mr. Shenker $260, exclusive of the $24 received as interest on the Osborn note.

The Lovegren mortgage fell due January 8, 1935, and according to Mr. Shenker the payment thereof was postponed for the reason that Mr. Spies had not delivered to him sufficient money to pay the mortgage and was unable at that time to furnish the difference. There is nothing in the evidence to show for how long a period the mortgage was extended.

On January 13, 1936, D. P. Price, attorney for Mrs. Lovegren, the mortgagee, wrote to Mr. Shenker acknowledging receipt of the latter's check for $35 dated January 11 of that year. In this letter Mr. Price stated that he knew "that it will be a disappointment to Mrs. Lovegren, from the fact that the other payment is not

forthcoming. In fact, one of the reasons for her calling the principal on this loan is the fact that the interest has been so irregular and more or less troublesome to collect." On January 29 of that year Mr. Price again wrote to Mr. Shenker, acknowledging receipt of a further payment of $35 on account of interest. On May 21, 1936, Mr. Price again wrote to Mr. Shenker, stating that he had been attempting to reach him by telephone "every day this week and left my 'phone number for you to call, but we have been unable to get in communication with each other". He then stated that he had received a letter from Mrs. Lovegren requesting that he take up with Mr. Shenker the payment of $35 as interest due April 8 on the Spies mortgage. On the following day Mr. Price again wrote to Mr. Shenker, explaining that on January 11 he had received Mr. Shenker's check for $35 in payment of interest due October 8, 1935, and on January 29, 1936, had received his check for $35 for interest due January 8, 1936; and that his letter of the previous day had reference to interest due April 8.

Mr. Shenker's explanation of his delay in making these payments of interest is that he and Mr. Spies believed that the rate of interest—7 per cent—was too high in view of the rates then prevailing, and that they thought that by delaying the payment of interest they could procure from the mortgagee a reduction in the rate. There is no documentary evidence or testimony other than that of Mr. Shenker to support this assertion. Had there been any attempt to obtain a reduction in the interest rate, some mention of it would undoubtedly have been made in one or more of Mr. Price's letters.

On September 18, 1936, Mr. Price again wrote to Mr. Shenker, stating that he was in receipt of a letter from his client saying that she had been in Mr. Shenker's office on August 6 and had been informed by Mr. Shenker that Mr. Spies had sold a piece of property at Oregon City and would pay $500 on the mortgage, "and that she would hear from you within ten days". He further stated that Mrs. Lovegren was much disturbed and was insisting that the mortgage be reduced immediately or she would institute proceedings to foreclose it.

Through the efforts of Mr. Shenker, Mr. Spies on October 21, 1936, sold two mortgages owned by him to Minnie Elizabeth Ankeny for $500. Mrs. Ankeny paid this money to Mr. Spies at his home, and the entire amount was immediately turned over to Mr. Shenker, who was present. Concerning this transaction Mrs. Ankeny testified: "Yes, and then Mr. Spies counted the money to Mr. Shenker, and I told Mr. Spies that I was sorry he couldn't keep that money for his own personal use and Mr. Shenker said: 'Oh, he will get to use it because I will put it in the bank with the other, and he has some property in Sellwood or Rose City,' I have forgotten which."

Mrs. Spies thus testified concerning this matter:

"Mrs. Ankeny gave it to Dad, to Mr. Spies, and she counted the money in Mr. Spies's hand, and Mr. Spies he took this money and gave it to Mr. Shenker, he counted this in his hand and then Mr. Shenker said, 'I will put this money away with the other moneys,' that is all what I know."

Mr. Shenker admits that he received the $500 from Mr. Spies and took it to his office. He further states

that when he reached the office it was too late to bank the money, and that the next morning before banking hours Mr. Spies came to his office and he, Mr. Shenker, returned the $500 to him but failed to take a receipt from him.

On or about November 23, 1936, Mr. Shenker paid $500 on the principal of the Lovegren mortgage and the interest past due. He testified that he made this payment by check out of money which had previously been loaned to him by Mr. Spies, and that it was not paid with the $500 which had just been turned over to him by Mr. Spies. He failed, however, to produce any canceled check showing such payment.

Under date of October 4, 1937, Mr. Price wrote to Mr. Spies, stating that he had been requested by Mrs. Lovegren to notify Mr. Spies that unless the note secured by the mortgage was paid in full on or before October 8 of that year, together with insurance premium advanced by her, she intended to proceed at once to foreclose the mortgage. This letter was received at Mr. Spies's home while he and Mrs. Spies were away visiting near Spokane, Washington. Mr. and Mrs. Sleight, son-in-law and daughter of Mr. and Mrs. Spies, were in charge of the Spies home while the Spieses were absent, and Mrs. Sleight opened the letter and called Mr. Price's office. Mr. Price advised her to get in touch with Mr. Shenker. After she had attempted a number of times to reach Mr. Shenker by telephone and failed to do so, her husband went to his office and gave the letter to him. According to Mr. Sleight's testimony Mr. Shenker then said: "Oh, . . . that is all taken care of . . . I took care of all that . . . You will probably get a letter like that or two but . . . just ignore it . . . there is nothing to it."

Later in the same month, on October 20, Mr. Price wrote to Mr. Shenker, stating that he had instructions to proceed with the foreclosure of the mortgage unless he was satisfied that the obligation would be paid in full in November. He further said that if Mr. Shenker had a *bona fide* purchaser for the property, he would extend the time of payment until the middle of November. Another letter to Mr. Shenker was written by Mr. Price on November 5, in which he agreed to extend the time until November 15.

As no further payments were received by her, Mrs. Lovegren instituted foreclosure proceedings on December 8. Summons and copy of complaint were served on both Mr. and Mrs. Spies and taken by Mr. Spies to Mr. Shenker's office. A demurrer to the complaint was prepared by Mr. Shenker and served on Mr. Price, but was not filed, although Mr. Price did not know of that failure until he went to the courthouse to argue the demurrer. Later, about January 3, 1938, Mr. Shenker served and filed an answer to the complaint, which answer contained a verification as described in the charges filed by the grievance committee of the Oregon State Bar. The answer put in issue many of the allegations of the complaint.

The cause was set for trial and Mr. Shenker was notified of the time, but when it was called for hearing he did not appear. The case was postponed and he was given notice of the time then set, but again he failed to appear. Decree was entered May 6, 1938, foreclosing the mortgage. The property was sold on June 13, 1938, for $1,844.12, the amount of the judgment and costs of execution and sale.

After the foreclosure proceedings were started Mr. Spies and his wife entered into a contract on December

11, 1937, to sell the mortgaged property to Mr. and Mrs. Weston for $2,500. On execution of the agreement $200 was paid in cash, and $25 was to be paid on the first day of each and every month, and not less than $1,850 on or before the first day of May, 1938. This sale was made, according to Mr. Shenker, through his efforts. The contract was drawn by him and no mention was therein made of the Lovegren mortgage or the foreclosure proceedings. Mrs. Spies testified that Mr. Shenker told Mr. Weston, with reference to the property, that "everything was clear". Mr. Shenker admits that he did not mention the mortgage to the Westons. The reason given by him for not doing so was: "Because, had I spoken to him of the existence of this $1,500 mortgage which was then under foreclosure I was convinced he would not agree to pay $2,500 for the premises." After two monthly payments had been made on this contract the purchasers withdrew from the agreement and early in March executed separate quitclaim deeds to Mr. and Mrs. Spies. Before those deeds were executed, however, Mr. Layley began negotiations with Mr. Spies and Mr. Shenker for the purchase of the property, and through Layley's efforts the quitclaim deeds were procured.

A tentative agreement was made between Mr. Spies and Mr. Layley for purchase of the property for $2,500. According to the understanding, Mr. Layley was to go into possession of the premises, paint and repair the dwelling at an estimated cost of $300 to $400, which was to be in addition to the purchase price of $2,500, and after getting the property reconditioned was to obtain a loan thereon from some governmental agency or a private individual. Mr. Layley entered into possession and was carrying out the terms of this under-

standing. On June 10 he called Mr. Shenker by telephone and told him that the house would be in condition by June 15 to obtain a loan on it, whereupon Mr. Shenker informed him that he had a man with money ready to make the loan.

Mr. Price, attorney for Mrs. Lovegren, on June 13 addressed a letter to the ''tenant'' at the street address of the mortgaged property, stating that Mrs. Lovegren had that day purchased the house at sheriff's sale, and instructing him to pay rental in the future at Mr. Price's office. Upon receipt of this letter on June 14 Mr. Layley went to see Mr. Spies. He testified that when Mr. Spies was informed of the contents of the letter he was dumfounded. Mr. Layley, accompanied by Mr. Spies, went to Mr. Shenker's office, and, as Mr. Layley testified, thereafter ''spent a good part of three days trying to contact him'', without succeeding.

Mr. Layley then went to Mr. Price's office. Asked if he was able to see Mr. Shenker about the letter, Mr. Layley testified:

''No, sir. I have never been able to contact him. I called his home, I went to his office, when I would get to his office they would tell me he was in Salem and was expected the next day at noon,—when I would go there the next day he would be at Seattle, and I would call his house and his wife would say that he was at the office, and at no time was I able to contact Mr. Shenker.

''Q. How long did you keep up your efforts? A. Ten days, I would say.''

Mr. Layley further testified that he had made four payments of $25 each on the property before receiving the above-mentioned notice from Mr. Price. He also stated: ''The only incumbrance that was against the property was the taxes, according to Mr. Shenker, and

the old man wanted to give him the money to clean up the two months, the first two months that were due on the taxes." The negotiations for sale of the property to Mr. Layley began on February 18 or 19, 1938, and the two months' taxes to which he referred must have been for the first two months of 1938.

When he was unable to contact Mr. Shenker with reference to the letter written by Mr. Price to the tenant residing on the mortgaged property, Mr. Spies on June 18 consulted another attorney, Mr. Levenson, and delivered to him Mr. Price's letter, the receipt that Mr. Shenker had given to him February 23, 1932, and the numerous additional receipts given him by Mr. Shenker for interest payments. This attorney telephoned Mr. Shenker and arranged for a meeting with him at Mr. Levenson's office.

In a letter dated June 24, 1938, to Mr. Shenker, Mr. Levenson referred to a telegram from Seattle which he had received on June 21, 1938, from Mr. Shenker, stating that the latter would see him Wednesday afternoon. The letter thus continued: "Wednesday you were busy, and promised to see me Thursday. Today [Friday] you definitely assured me that the matter would be adjusted and the papers showing satisfaction of the mortgage delivered to me before the close of the day. Mr. Jack Layley claims to have entered into a contract for the purchase of the property from Mr. Spies, and I called Mr. Joe Price, attorney for the mortgagee, who called me and told me that he hasn't heard from you in any wise regarding this matter." Mr. Levenson then went on to state that from the facts given him by Mr. Spies it would appear that $2,000 had been placed in Mr. Shenker's hands for the purpose of satisfying the mortgage, which had not been done.

On the following day, June 25, Mr. Shenker acknowledged receipt of that letter and stated that his record indicated that he received $1,166, plus a note for $400, from Mr. Spies, and that $500 had already been paid on the mortgage. He further wrote: "In addition thereto, however, there has been received by myself, some other small payments, receipts for which are in the possession of Mr. Spies. However, a perusal of this transaction, mathematically, indicated to me that there is a differential in excess of $200 in interest expended, as compared to that received, plus attorney's fees in the foreclosure suit handled on behalf of Mr. Spies, face amount $3,000, plus other divers matters." In this letter he enclosed a certified check for $1,169.12, "which is calculated on the basis of the amount of outstanding interest and other costs in the foreclosure, plus $1,000 on the principal." The letter also stated: "If you will kindly render me statement of the alleged payments, I will be glad to reconcile them with my books and if there is additional due, same will be credited and paid to you on behalf of Mr. Spies, together with such reasonable attorney's fees as you may agree upon with Mr. Price." In answer to this letter Mr. Levenson called attention to the fact that Mr. Spies had paid Mr. Shenker enough to satisfy the mortgage.

An arrangement was then made between Mr. Levenson and Mr. Shenker for a conference in the office of the former at two o'clock on June 30. Between twelve noon and one o'clock that day Mr. Levenson met Mr. Shenker and reminded him of his appointment, and the latter promised to be present. Mr. Spies was at Mr. Levenson's office at the appointed time and after he and the attorney had waited until about 3 o'clock,

Mr. Levenson called Mr. Shenker's office and was informed that he was out of town.

On July 7 Mr. Levenson wrote Mr. Shenker, calling attention to the fact that the latter had not kept his appointment on June 30 and that since that time Mr. Levenson had been endeavoring to contact him, but without success.

We shall now refer more in detail to Mr. Shenker's testimony. When the Osborn matter was settled and Mr. Shenker received $1,166.67 and the $400 note from Mr. Spies, the money and the note, Mr. Shenker stated, were turned over to him by Mr. Spies on the latter's own suggestion, for the reason that "Mr. Spies at the time was concerned relative to financial situations in this vicinity and nation wide, banks were offering very low rates of interest, many of them were becoming insolvent and had closed their doors, and he asked me if I would be willing to hold that money and pay him for the use thereof four per cent per annum. I indicated that I would, and hence that agreement was entered into." In further explanation of the loan to him Mr. Shenker stated: "It was my understanding prior to the execution of the instrument that all moneys in my possession and loaned to me at four per cent were to be applied ultimately on the redemption of the mortgage." The funds received from Mr. Spies were used by Mr. Shenker in his own business.

No record was kept by Mr. Shenker of the various amounts of money turned over to him by Mr. Spies, with the exception of the first two payments of $30, which he noted on the folder of the Osborn case. He stated that one of the reasons for not keeping records was that: "I was convinced that nothing would be lost by Mr. Spies, he was meticulously careful about his

papers, and he kept everything, he had papers in his possession dating back fifteen or twenty years, mortgages and deeds and satisfactions and what not".

Another reason for not keeping a record of the moneys received and disbursed by him, as given by Mr. Shenker, was that, "I considered that as a business transaction out of any client and attorney relationship." Mr. Shenker testified that in regard to fees due him from clients he kept books showing amounts due and payments thereon made. He produced no books of his accounts at the hearing and was unable to produce the originals of the letters received by him which we have hereinbefore mentioned, except a letter from Mr. Price dated May 17, 1938, advising him that the mortgaged property would be sold at sheriff's sale on June 13 of that year.

Mr. Shenker stated that Mr. Spies at no time requested him to pay on the Lovegren obligation the money which he had on hand, and that had any such request been made, he would gladly have complied with it; that he at all times had sufficient money in his checking account or in a safety deposit box to pay the amount which had been advanced to him by Mr. Spies. He further stated in this connection that prior to the $500 payment in November, 1936, the value of real property in Portland had greatly decreased and that Mr. Spies thought it would be better not to make any payment on the principal of the obligation unless the property could be sold for more than the amount of the mortgage. Later, prices of real property advanced, and the $500 payment on principal was made in November, 1936. Shortly after this payment there occurred another depression, and again Mr. Spies advised him that it would be better not to make any further pay-

ments, due to the decrease in value of real property, unless this property could be sold for more than the mortgage.

In the answer which Mr. Shenker filed he attempts to set forth an account of his financial transactions with Mr. Spies. Charged against Mr. Spies are attorney's fees, as hereinabove stated, amounting to $425. Included in this amount is an item of $175 as fee for handling the Osborn litigation, which litigation, however, preceded the original loan made by Mr. Spies to Mr. Shenker, February 23, 1932. Mr. Shenker also entered a charge of $60 for collection of the $400 Osborn note, a charge of $50 in connection with the Weston transaction, and one of $75 for the sale of mortgages to Mrs. Ankeny.

Mr. Shenker admits that he at no time rendered to Mr. Spies any statement of fees due himself, and that he had no book accounts of any charges which he had made against that client for fees. His explanation was that he had not submitted an account to Mr. Spies for the Osborn matter for the reason that he then expected other legal business from him. He testified that during their relationship as attorney and client, attorney's fees were mentioned on numerous occasions, but Mr. Spies told him that when the Lovegren matter was finished, or, as he says Mr. Spies put it, "fertig", they would take up the question of attorney's fees.

It has already been pointed out that on June 25, 1938, Mr. Shenker sent to Mr. Levenson a check for $1,169.12. Of this amount $169.12 was intended by Mr. Shenker to cover the court costs in the Lovegren foreclosure, with the exception of the $175 attorney's fee allowed Mr. Price. The amount for which the mortgaged prop-

erty was sold at sheriff's sale was $1,844.12. The principal unpaid on the mortgage was $1,500, which Mr. Shenker in his computation deducted from the larger amount, leaving a balance of $344.12. He then subtracted from that balance $175 as attorney's fee allowed Mr. Price, leaving a remainder of $169.12. The amount of Mr. Price's fee was not included in the check sent by Mr. Shenker to Mr. Levenson for the reason, as explained by Mr. Shenker, that he thought perhaps Mr. Levenson could prevail upon Mr. Price to reduce the amount of his fee. In his letter of June 25, 1938, to Mr. Levenson, Mr. Shenker stated, as above noted, that he would pay "such reasonable attorney's fee as you may agree upon with Mr. Price."

Mr. Shenker explained that he personally verified the answer in the foreclosure suit for the reason that he had gone to the Spies residence and had rung the door bell and rapped on the door but had been unable to find any one at home. The evidence of the various members of the Spies household was to the effect that there had been no door bell at the Spies home for some six or eight years, that Mr. and Mrs. Spies were almost invariably at home, and that they had a married daughter who was at their home at all times, due to the fact that she had previously suffered a stroke and was unable to speak, although she was otherwise physically unimpaired.

The trial committee found the accused not guilty of misappropriating his client's funds, adding that the evidence tended to support the contention of the accused that the money was loaned to him by Mr. Spies. Regarding the second charge, the committee found that Mr. Shenker falsely represented to Mr. Spies "between

January 8, 1935, and February 19, 1938, that he had applied on the Lovegren mortgage moneys received from Spies and collected by Shenker on his account, and that he had led Spies to believe that the Lovegren mortgage had been discharged." The third charge, accusing Mr. Shenker of making a false and fraudulent verification of the answer filed in the Lovegren foreclosure suit, was found by the trial committee to be proved by the evidence.

The trial committee recommended that Mr. Shenker be suspended from the practice of law for the period of one year, "provided, however, that if within thirty days after the final determination of these proceedings he pay to the estate of Jacob Spies the sum of $564.03 in cash and releases all claims for legal services performed for Jacob Spies, then that the period of suspension be reduced to ninety days." The manner of arriving at the above sum of money is set forth in the committee's findings.

The board of governors, after hearing oral argument by the attorneys for the accused, adopted the findings and recommendation of the trial committee. These findings and recommendation, together with the transcript of testimony and the exhibits introduced before the trial committee, were filed with the clerk of this court. No petition to review the recommendation or to reverse or modify the same was filed by the accused. After considering the record in this case the court set the matter down for hearing. Oral arguments have been presented by counsel for the Oregon State Bar and for the accused. There has also been submitted a memorandum of the evidence and law on behalf of the accused.

We do not believe that there is the slightest doubt, from the entire record, that Mr. Shenker not only received the $500 paid by Mrs. Ankeny to Mr. Spies but that he retained that money and did not return it to his client. He received the money on October 21, 1936, and at that time Mr. Spies had turned over to him such other funds as would, added to the interest due from Mr. Shenker, have been almost sufficient to discharge the Lovegren obligation. If we accept the finding of the trial committee that Mr. Spies had paid Mr. Shenker $260 to apply on interest, then there was lacking less than $46 of the amount necessary to satisfy the mortgage. The only controversy as to interest paid by Mr. Spies concerns one item of $30. We are further of the opinion that Mr. Spies believed that upon the payment of this $500 to Mr. Shenker he had paid to the latter enough money, in view of the interest to be paid by Mr. Shenker, to discharge fully the Lovegren obligation.

The receipt which was given by Mr. Shenker to Mr. Spies on February 23, 1932, referred to a balance of principal amounting to $433.33. During the first year following the date of this receipt Mr. Spies paid to Mr. Shenker in installments more than the difference between 7 per cent and the 4 per cent required of the latter by their agreement. The record also proves to our satisfaction that from the time of the receipt of the above-mentioned $500, Mr. Shenker led Mr. Spies to believe that the Lovegren mortgage was satisfied and discharged. The verification by Mr. Shenker of the answer filed in the suit to foreclose that mortgage bespeaks an intent to prevent the mortgagor from discovering the falsity of this representation.

Very little weight should be attached to Mr. Shenker's assertion that he had neglected to pay the interest installments when due in order to obtain a lower rate of interest. At the time the delay in payments occurred the mortgage was past due, and there is no intimation in the letters from Mr. Price that a reduction in the rate of interest had ever been discussed. The further assertion by Mr. Shenker that payment of principal was delayed because of the decline in value of real property does not impress us. The Lovegren mortgage was executed in 1932, when the value of real property was low. There seemed to be no trouble in finding purchasers who were willing to buy the property at a valuation of $2,500. The only reason for the abandonment of the Weston contract was that marital difficulty had arisen between the joint purchasers. Moreover, the annual rental of the property amounted to about $300. After the sale on foreclosure the property was redeemed by Mr. Spies or his estate, and Mr. Layley then proceeded with the purchase thereof according to the previous understanding between him and Mr. Spies.

Mr. Shenker was admitted to the practice of law in 1930, just after he reached the age of majority. He had been practicing less than a year and a half when he met Mr. Spies. He received the equivalent of over $1,500 from his client and according to his own version the money was a loan to him, for which he was to pay 4 per cent interest. He apparently had nothing to offer as security. He used this money immediately in purchasing scrap iron or in some other commercial venture. According to Mr. Shenker, he was not paid for legal services he rendered to Mr. Spies, nor was there an understanding as to the amount of his fees. It seems

strange indeed, had he not been paid any fees and had he intended to charge Mr. Spies for his services, that he would have given the kind of receipt that he furnished his client. It would probably have been impossible for Mr. Shenker to obtain such a sum of money from any other source for his speculative enterprises, without security, which he apparently did not have; and certainly he could not have procured it at 4 per cent interest. He would have it believed that the money was virtually thrust upon him by Mr. Spies.

In the account Mr. Shenker sets forth in his answer he includes an item of $60 as fee for collecting the $400 Osborn note. This note was payable two years after date and according to Mr. Osborn's testimony, which was virtually admitted by Mr. Shenker, the principal was paid in installments of $100 and the entire obligation was paid within two years after date.

We need not go further into the merits of Mr. Shenker's claim for attorney's fees, as he admits that he kept no record concerning the services which he performed for Mr. Spies, although he did keep accounts with reference to other clients. The question of whether he had or had not fees due from Mr. Spies had no bearing on Mr. Shenker's failure to see that the Lovegren mortgage was satisfied as he undertook to do and represented that he had done. Had he performed his duty in this regard, and advised Mr. Spies on October 21, 1936, when the latter turned over $500 to him, that Mr. Spies was then short $46 or $76, as the case might have been, of the amount necessary to discharge the mortgage, Mr. Spies undoubtedly could have supplied the deficiency.

The trial committee, as hereinbefore stated, found that the first charge against Mr. Shenker, namely, that of misappropriating his client's money, was not sustained by the evidence. We concur in this finding as applied only to the first payment by Mr. Spies to Mr. Shenker, that of $1,166.67 cash and a note for $400, and with this further qualification that although the money was loaned to Mr. Shenker the latter nevertheless promised to apply it on the Lovegren mortgage. It was not merely a loan in the ordinary course, obliging the borrower to repay the money to the lender. As to the $500 obtained by Mr. Spies from Mrs. Ankeny and turned over by him to Mr. Shenker, a different question is presented. The Lovegren mortgage was then long past due, and this sum of money should have been applied at once on that indebtedness. According to Mr. Shenker's own testimony, he did not so apply it. He denies that he retained it at all, except over night. In view of the facts in the case and Mr. Shenker's own testimony, we must regard his treatment of this money as bordering on, if not actually constituting, misappropriation of his client's funds.

■ The second and third charges against Mr. Shenker are amply supported by the preponderance of the evidence, and we concur in the findings of the trial committee as adopted by the board of governors, touching upon these charges. The recommendation made by the committee and approved by the board of governors, however, does not measure up to the gravity of the offense. By the acts and misrepresentations of the accused much additional expense was imposed upon Mr. Spies or his estate, to say nothing of the annoyance and inconvenience caused that client. It is apparent

that Mr. Spies did not know that the mortgage had not been satisfied until after the tenant in possession of the property was notified by Mr. Price that the property had been sold on foreclosure. It is true that the complaint and summons were served on Mr. Spies, but he was then approximately eighty-two years of age, could not read English very well and did not understand the effect of legal documents. He had previously thereto been told by his attorney that the mortgage had been satisfied.

The mortgaged property was sold on foreclosure for $1,844.12. After the sale Mr. Shenker sent to the attorney then representing Mr. Spies a check for $1,169.12, leaving a difference of $675. If we deduct therefrom the $76 which at the most Mr. Spies's principal and interest payments lacked to satisfy the mortgage, we have a balance of $599 remaining as the difference supplied by Mr. Spies or his estate to redeem the property. This additional expense was caused solely by Mr. Shenker's misrepresentations and his failure to perform his duty.

■■ In reaching a conclusion in this matter we have taken into consideration what was actually done by the accused prior to the time charges were filed against him, and, in addition, his attitude during the hearing of the matter before the trial committee. It is not necessary here to point out specifically the inconsistencies in his testimony and his willingness to place upon his client all the responsibility for not having satisfied the mortgage. We have also kept in mind the youth of the accused and the fact that so far as the record discloses he has not heretofore been subject to charges of unethical conduct.

It is the order of this court that William S. Shenker be suspended from the practice of law, such suspension to begin at once and to continue for a period of two years from the date of his making full restitution to the estate of Jacob Spies, deceased, or whoever is entitled to payment, of the sum of $599, together with interest thereon at the rate of 6 per cent per annum from June 13, 1938, the date of the sale of the property on foreclosure.

RAND, C. J., and BEAN, KELLY, BELT and LUSK, JJ., concur.

ROSSMAN, J., not sitting.